[No. 2357.]

ROBERT MORROW *v.* THE STATE.

1. CATTLE THEFT—EVIDENCE.—A BILL OF SALE is an instrument of writing which is permitted and required by law to be recorded in the office of the county clerk. It is, therefore, such an instrument as comes within the provisions of Article 2257 of the Revised Statutes, and may be read in evidence without proof of its execution, provided it has been filed

among the papers of the cause at least three days before the com-
mencement of the trial, and notice of such filing given to the opposite
party or his attorney. Having failed to so file the bill of sale involved
in this case, and to give due notice, the State was not entitled to intro-
duce the same in evidence without proof of its execution.

2. SAME.—A State's witness testified that he was present at the execution
of the bill of sale, and saw it signed by the vendors. The defense ob-
jected to the evidence as secondary, the bill of sale showing on its face
that it was signed by one M. as a subscribing witness, whose non pro-
duction was not accounted for or explained by the State. *Held*, that the
objection was well taken and should have been sustained.

3. SAME—OWNERSHIP.—It is only necessary in a prosecution for theft of
property to prove that the alleged owner of the same had the possession,
charge or control thereof, such possession, charge and control consti-
tuting such person the owner for all the purposes of the prosecution,
although he may not be, in fact, the legal owner. Therefore, an un-
acknowledged, unrecorded bill of sale of property, though insufficient to
vest legal title in the vendee, would be evidence, in a prosecution for the
theft of the property, to prove such ownership in the property as the
law recognizes to be sufficient.

4. SAME—CASE STATED.—The indictment alleged the ownership of the ani-
mal to be in one Lee. Lee testified that he was a stock holder in, and
the general manager in Texas of, the "Kentucky Land and Cattle Com-
pany," and as such had sole charge, care and control of all the cattle in
Texas belonging to the said company, but that he knew nothing about
the particular animal described in the indictment, and did not know
that it belonged to the said company. To establish the company's
ownership the State introduced a certain bill of sale conveying to the
"Louisville Land and Cattle Company" about four thousand five hun-
dred head of cattle, ranging in King and Palo Pinto counties, in various
marks and brands, including the brand in which the animal in contro-
versy was branded. *Held*, that the legal effect of the said bill of sale
does not support the allegation of ownership, because there was no proof
to establish the identity of the "Kentucky Land and Cattle Company"
with the "Louisville Land and Cattle Company;" and the bill of sale
not purporting to convey *all* of the cattle in said brand, the failure of
the proof to show that the alleged animal was one of those conveyed by
the bill of sale was fatal to the allegation of ownership.

5. SAME.—It is no objection to the admissibility in evidence of a bill of sale
that it was not recorded until after the date of the alleged theft.

6. SAME—FACT CASE.—See the opinion and the statement of the case for
evidence *held* insufficient to support a conviction for cattle theft because
insufficient to support the allegation of ownership.

7. SAME—CHARGE OF THE COURT to the effect that if the defendant pur-
chased the alleged stolen animal in good faith he should be acquitted is
error. A purchase, whether in good or bad faith, is not a taking, and a
fraudulent taking is essential to constitute theft.

APPEAL from the District Court of Parker. Tried below before W. R. Vivrett, Esq., Special Judge.

The conviction in this case was for the theft of one head of cattle, alleged, in the indictment, to be the property of John A. Lee. The indictment was presented in Palo Pinto county, impleading, also, one H. C. McDonnell. It alleged the venue of the offense to be in Palo Pinto county, and that it was committed on the sixteenth day of May, 1883. A severance and a change of venue to Parker county were awarded this defendant. His conviction in the latter county was supplemented with a term of two years in the penitentiary.

H. C. McDowell was the first witness for the State. He testified that he lived in Palo Pinto county, Texas, in May, 1883. On the evening of the fifteenth day of that month, the defendant came to the house of the witness, and told witness that he was going on the range to get a steer in the TOM brand, that he had bought from Tom Saunders. He came back about dusk driving a steer, which he penned at the witness's house. Witness did not see the steer on that evening. Just before daylight on the next morning the defendant killed the steer by knocking it in the head with an axe, while the witness held the rope with which it was tied. William McDowell was present. W. S. Cox came up about the time the skinning commenced, and helped defendant skin the animal while witness held its legs. The witness did not then observe the brand because the animal was propped on its back during the process of skinning, and the brands were thus rendered invisible to the witness. At about sunrise Cox, as directed by defendant, left with the beef, which he took to Gordon and sold to Messrs. Brown & Scoggins, butchers. Witness's son, William, took the hide to witness's house, pinned it to the ground and salted it. A day or two afterwards witness took the hide up, and examined the brands. The brand TOAD was on the left side, and HU barred out was on the hip. The steer was killed on Saturday morning. On Monday or Tuesday morning defendant came to witness's house and cut a strip from the hide which included the said brands. He carried the strip off with him.

Cross examined, the witness testified that he paid Cox for hauling the beef to Gordon by discharging his debt of a dollar and a half to old man Sharpe. The animal killed by defendant was a white and red pided, small three year old steer. It ran at

large on the Ballard and Rogers range. When witness took the hide from the ground and found the brand TOAD, he put it in his granary window with the brand out so that it could be readily seen by every passer by. Witness got a "mess" of the beef. He left Palo Pinto county in July or August, 1883, and went to Somervell county, where he now lives. He was indicted with the defendant in this case, but the prosecution against him was dismissed by the State's counsel of his own motion. No promises of immunity from prosecution or of reward were made the witness for his testimony in this case. Jim Owens told witness that the Northwest Cattle Association had a standing reward of one thousand dollars offered for the conviction of parties convicted of stealing cattle from any of its members, and that he had employed Captain Farr to collect the reward for him in case the defendant was convicted in this case. Before hearing this, however, witness testified on the former trial of this case, in Palo Pinto county, and told substantially the same story he has told on this trial. Witness did not tell George McDonald that he was to get a part of the reward for swearing in this case. He said nothing to McDonald in a store in Palo Pinto which could be tortured into the equivalent of such a statement. McDonald himself told witness that, as a reward had been offered for such convictions, the witness and his daughter might as well have it in this case as Jim Owens. Witness was required by the county attorney to make a complaint against the defendant for the theft of this animal. Having made that complaint against his wishes, the witness on his way home said to one Froman that defendant was in a close place and had better get away, but he did not say that he was afraid he would get into trouble himself. The killing of the animal described occurred in Palo Pinto county, Texas.

Re-examined, the witness testified that, on the day the beef was slaughtered, he went with the defendant and W. S. Cox to Gordon, Cox taking a piece of machinery for the witness, and witness going along to have it repaired. Witness did not go with the defendant to the butcher shop when the beef was sold, but stopped at the machine shop. He did not see the beef sold, had no interest in it, and received no part of the money realized for it.

Bettie McDowell was the next witness for the State. She testified that she was at the house of her father, H. C. McDowell, in Palo Pinto county, Texas, on the morning of Saturday, May

16, 1883, when the animal described in the indictment was killed. She did not see it killed, as she was then sick with measles, but on the following Wednesday or Thursday she saw its hide staked out in her father's yard. The defendant came to the house afterwards and cut a strip from the hide, which included the brand, and took it off. The hide was branded TOAD on the side. The beef was hauled off in Cox's wagon, but witness did not know who went off with it. Witness saw her father take the hide to the granary and put it in the window. The neighborhood road passed the granary at a short distance.

William McDowell, son of H. C. McDowell, was the next witness for the State. He testified that defendant drove the steer mentioned in the indictment to witness's father's house on Friday evening, May 15, 1883, having taken it up, he said, as a TOM steer belonging to Tom Saunders. The steer was killed next morning before daylight. H. C. McDowell held the animal while defendant knocked it in the head. W. S. Cox and defendant skinned it. If defendant afterwards came to the house for the hide witness did not know it, but the witness was away from home for several days after the animal was killed.

W. S. Cox testified, for the State, that he lived on McDowell's place, in Palo Pinto county, Texas, in May, 1883. On the evening of the fifteenth day of that month, defendant drove the steer in question up to the McDowell pen. On the same evening, old man McDowell came to witness's residence and arranged with him to haul the beef to town next day for defendant, and satisfied old man Sharpe for a load of wood witness was to haul him, in order to leave witness free to go. Witness was also engaged by McDowell to haul some machinery to town for him. The animal was killed next morning about day light, old man McDowell holding it while defendant knocked it in the head with an axe. Witness and defendant skinned it while McDowell held its legs. The witness, the defendant and H. C. McDowell went to town together in the wagon with the beef and machinery. McDowell stopped at the blacksmith shop with his machinery, and witness and defendant took the beef to the butcher shop, where it was sold to Brown & Scoggins, the defendant receiving a sum of money from Scoggins in payment. After the animal was killed, the hide was staked to the ground in McDowell's yard. A day or two afterwards, Jay Kerr came to McDowell's house, took the hide up and examined it. On either Wednesday or Thursday, defendant came to McDowell's house and cut a

strip from the hide, which strip included the brands, and carried it away with him, tied behind his saddle. A man named Abell examined the hide after it was placed in the granary window. The witness denied that he ever told one Brannan that when he reached the parties with the beef, early on Saturday morning, he found defendant with a pistol; that old man McDowell asked witness to go around a mountain for some purpose; that witness went, and when he got beyond sight of the parties a pistol fired, and that when he got back he found the steer dead. He did not tell Brannan that defendant held the steer and McDowell knocked it in the head. McDowell made the arrangement with witness to haul the beef to Gordon. Larkin Jones came to McDowell's place on the evening of May 15, after the animal had been penned. Defendant told him that he was going to kill a TOM beef on the next day, and to come and get some of it. Witness hesitated when McDowell asked him to haul the beef, but McDowell told him defendant was all right, and he consented.

Jay Kerr testified, for the State, that he examined a red and white pided steer hide in the yard of H. C. McDowell, a few days after May 16, 1883. It was then stretched with the hair side down. It was branded TOAD on the side and a blotched brand on the hip, and the tail was bobbed. Cox was then at work about three hundred yards from McDowell's yard. McDowell's oldest boy was present when witness examined the hide.

George Brown testified, for the State, that he was the senior member of the butcher firm of Brown & Scoggins, who did business in Palo Pinto in May, 1883. Scoggins is now dead. Brown & Scoggins bought some beef from the defendant on the sixteenth day of May, 1883, Scoggins paying the defendant four dollars in money, and canceling defendant's debt of five dollars to the firm.

D. E. Ballard testified, for the State, that on the evening before the alleged killing of the animal, he saw the defendant going towards McDowell's house. He was either driving or following a small drove of McDowell's cattle, in which drove was a small red and white pided animal, branded TOAD on the side. That animal was strange to witness. He had never seen it on the range before.

J. A. Lee testified, for the State, that in May, 1883, he was a stock holder and the general manager of the Kentucky Land and Cattle Company, a corporation organized under the laws of

Kentucky, and he had exclusive care, control and management of all the company's cattle in the State of Texas. The company's main ranch was in King county, Texas, but it owned a remnant of cattle ranging near Sparta, in Palo Pinto county. Witness was never absent from Texas, except occasionally in the winter, when he left his superintendent in charge of the company's property and employes. The superintendent's authority did not extend to the sale or assignment of any of the company's property, but was limited to its supervision during witness's absence. The witness knew nothing whatever about the animal involved in this prosecution. He had never given the defendant or any body else authority to take or kill it.

At this point the State introduced the bills of sale described in the opinion, and then closed.

George McDonald testified, as the first witness for the defense, that he was merchandising in Palo Pinto, and at the second term of the Palo Pinto county district court prior to this trial, he had a conversation at his store with the State's witness, H. C. McDowell. McDowell then told witness that he and his daughter were to get a part of the $1000 reward for testifying in this case, and Cox was to get the other part. Witness heard said McDowell testify on the former trial of this cause. He said nothing on that trial about his putting the animal's hide through his granary window in such a manner as that the brand could be seen from the road. Otherwise he testified about as he did on this trial. J. A. Lee, a State's witness, was a member of the Northwest Texas Cattle Association and it was the understanding of the witness that that association had a standing reward of one thousand dollars offered for the conviction of any person stealing an animal belonging to any member of that association.

James Brannon testified, for the defense, that the State's witness, W. S. Cox, made three different statements to him about the killing of the animal involved in this case. At witness's house, about fifteen months prior to this trial, the said Cox told witness that he drove the wagon to McDowell's house just before the animal was killed; that defendant and McDowell were present, McDowell holding the steer; that McDowell told witness to look in another direction, which witness did, and defendant struck and killed the steer, and "they" skinned it. At another time, in the town of Palo Pinto, Cox told witness that when he got to McDowell's house he found McDowell and defendant at the pen; that the defendant had a pistol in his hand; that Mc-

Dowell told him to go around a neighboring mountain, which he did ; that when behind the mountain he heard the report of a gun, and when he returned he found the animal dead, and helped skin it, after which it was taken to Gordon and sold. At another time Cox told witness that defendant held the steer while McDowell struck and killed it. Witness knew Cox's reputation for truth and veracity to be bad.

Dock Abell testified, for the defense, that he examined the hide of an animal that he found thrust partly through the window of a small granary belonging to McDowell. He had to pull that hide nearly entirely out of the window in order to see the brands—TOAD on the side, and a blotched brand on the hip. If Cox was any where near at that time witness did not see him. The neighborhood road ran about thirty yards distant from the granary.

D. E. Ballard testified, for the defense, that the reputation of the State's witness H. C. McDowell for truth and veracity was bad.

Thomas Froman testified, for the defense, that he examined a red and white pided steer hide at McDowell's residence, two or three days after the alleged theft. It was branded TOAD on the side, T on the shoulder, and perhaps a blurred brand on the hip. Witness knew this to be the hide of an animal which had run on his range for nearly two years, and which, ten or fifteen days before the alleged theft, the defendant claimed as property pur-chased by him from Tom Glenn. The witness aided Lazarus gather cattle in 1882. They gathered three or four head of TOAD cattle, but did not find the animal described in the indictment. McDowell came to witness's house in June, 1883, and told wit-ness that he had filed a complaint against the defendant, and asked witness to tell or send defendant word to get away, in as much as both of them, defendant and McDowell, might become involved in trouble. Tom Glenn, now deceased, worked for W. K. Baylor in 1883. The cattle delivered by W. K. Baylor to La-zarus & Co. had their tails bobbed off. The one in controversy did not. The witness knew Tom Saunders in 1883, and knew that at that time he owned cattle on the range branded TOM.

Bob Baker testified, for the defense, that he was at a "round up" on Dobson's prairie in July or August, 1882, with the defend-ant and Tom Glenn. Among the cattle rounded up was a small red and white pided TOAD steer which Glenn claimed as his own, and sold to the defendant. Tom Cotney, Green Hammond,

who has since fled the country, Mike McCormus, since deceased, Tom Glenn, Tom Froman, witness and perhaps others, were on that "round up." Witness did not know that any of the parties, save himself and Green Hammond, heard the trade, which took place about a mile and a half from Froman's ranch.

Tom Cotney testified, for the defense, that he was on the "round up" mentioned by the witness Baker. Tom Glenn claimed to own a certain small white and red pided steer branded TOAD on the side, which he offered to sell the witness for fifteen dollars. The witness had not seen the said steer since. Defendant was on that "round up." The defense closed.

W. K. Baylor testified, for the State, in rebuttal, that in 1882 he was the senior member of the cattle firm of Baylor & Lanham. That firm disposed of its cattle in August, 1882. Witness attended the general spring round up of 1882. The Baylor & Lanham cattle were cut out of the herd before Dobson's prairie was reached. Tom Glenn, who then worked for witness, was sent back by the witness from Village Bend, late in April, before Dobson's prairie was reached, and was not at the general round up on Dobson's prairie. Witness had never sold, traded or paid Tom Glenn a single head of cattle branded TOAD or otherwise. Defendant was in witness's employ while witness owned the TOAD brand of cattle, and was familiar with the brand. The TOAD cattle sold by witness to Curtis, Atkinson & Lazarus had their tails bobbed, as delivered. Tom Glenn may have been at some "round up" in the summer of 1882. After the general round up of 1882 on Dobson's prairie, the defendant brought the witness four head of his cattle.

W. S. Cox, recalled for the State, testified in rebuttal that whether or not he was seen by Kerr and Abell when they separately inspected the hide at McDowell's house, he saw them.

[NOTE.—In stating the name of the party jointly indicted with the appellant as "H. C. McDonnell," and the name of the first witness who testified that he was jointly indicted with the appellant, as "H. C. McDowell," the record has been followed.—REPORTERS.]

The motion for new trial raised the questions discussed in the opinion.

*McCall & McCall* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE.   The indictment alleges that John A. Lee owned the animal charged to have been stolen by the defendant. Lee testified that he was a stock holder in, and the general manager of the Kentucky Land and Cattle Company, a corporation organized under the laws of the State of Kentucky, and that he had exclusive control, care and management of all the cattle of said company in the State of Texas.  He stated that he knew nothing about the particular animal mentioned in the indictment, and did not know that it belonged to the said company.

The prosecution undertook to prove ownership of said animal to be in said company, first, by a bill of sale from Curtis, Atkinson & Lazarus to the Louisville Land and Cattle Company, conveying about four thousand five hundred head of cattle, ranging in King and Palo Pinto counties, in various marks and brands, among said brands the one with which the animal in contro· versy was branded, to wit, TOAD.   This bill of sale was dated February 23, 1883, acknowledged for record September 21, 1885, recorded in Palo Pinto county September 16, 1885, *before* it had been authenticated for record.   Second, a bill of sale from Baylor & Lanham to Sam Lazarus, conveying the said vendor's entire stock of cattle branded TOAD, dated August 15, 1882, acknowledged on the eighteenth day of August, 1882, recorded in Palo Pinto county September 4, 1883.   Third, record of the mark and brand of W. K. Baylor and T. G. Kirbie, said brand being the said TOAD brand, recorded in Palo Pinto county September 27, 1880, said W. K. Baylor being the same Baylor who joined with Lanham in conveying said brand to Lazarus.

This testimony was all admitted over the objections of the defendant.   One objection made to the first bill of sale was that it had not been filed in the cause three days before the trial, and notice of such filing given to defendant, and that its execution was not properly proved.   A bill of sale is an instrument of writing which is permitted and required by law to be recorded in the office of the clerk of the county court.   (Rev. Stats., Arts. 4331–4564.)   It is such an instrument, therefore, as comes within the provision of Article 2257, Revised Statutes, and may be read in evidence without proof of its execution, provided it has been filed among the papers of the cause at least three days before the commencement of the trial, and notice of such filing given to the opposite party or his attorney.

In this case the bill of sale was not filed and notice of such filing given to the defendant or his attorney, so as to render the same admissible without proof of its execution. (Allison v. The State, 14 Texas Ct. App., 402.) But the State proved the execution of said bill of sale by the witness Lee, who testified that he was present when the same was executed, and saw it signed by the vendors. This testimony was objected to by the defendant at the time it was offered, because it was secondary, the bill of sale showing upon its face that its execution was witnessed by one Robert McCart, who signed the same as a subscribing witness, and the State had shown no reason why the testimony of said subscribing witness was not produced. It seems from the authorities that defendant's objection should have been sustained. (Sample v. Irwin, 45 Texas, 567; Craddock v. Merrill, 2 Texas, 494; White v. Holliday, 20 Texas, 679; 1 Greenlf. Ev., Sec. 3, 572, 574.)

Other objections made to this bill of sale as evidence are not, in our opinion, tenable. An unacknowledged, unrecorded bill of sale of property while it might not, under the law, vest the legal title in the vendee, would be evidence in a prosecution for theft of such property, to prove such ownership in said property, as the law in such case recognizes as sufficient. It is only necessary in a prosecution for theft of property to prove that the alleged owner of the same had the possession, charge or control thereof. Such possession, charge and control constituted such person the owner for all the purposes of the prosecution, although in fact he may not be the legal owner. (Code Crim. Proc., Art. 426; Penal Code, Art. 729.)

As to the legal effect of said bill of sale, it conveys about four thousand five hundred head of cattle in certain marks and brands, to the "Louisville Land and Cattle Company," not to the "Kentucky Land and Cattle Company," of which latter company Lee testified he was the manager, etc. It does not convey any title or right to the cattle to the company represented by said Lee, unless said two companies are one and the same; which is not shown to be the case. It was, therefore, no evidence of ownership of said cattle in Lee or the company which he represented, to wit, the "Kentucky Land and Cattle Company," which company, for aught that appears from the record, may be an entirely different corporation from the "Louisville Land and Cattle Company" mentioned in the bill of sale.

Nor does the bill of sale convey, or purport to convey, the

TOAD brand, nor all of the cattle in that brand. For aught that appears from the record, there may have been thousands of cattle in that brand running in the range in Palo Pinto county, not conveyed or intended to be conveyed by said bill of sale, and which were not the property of said company, and which were not in the possession of the said Lee. Hence, we say that the legal effect of said bill of sale was not to convey to said company *all* the cattle in Palo Pinto county branded TOAD, or any particular cattle bearing that brand. Therefore this bill of sale does not of itself prove that the Louisville Land and Cattle Company owned the particular animal named in the indictment in this case, even conceding that said bill of sale was properly in evidence, and that said TOAD brand was also properly in evidence and shown to belong to said company. There must be further proof, showing that this particular animal was one of the four thousand five hundred conveyed by said bill of sale, before it can be said that the allegation of ownership has been established.

As to the second bill of sale, it was objected to upon the single ground that it was not recorded until after the alleged date of the theft. This objection was not a valid one.

As to the record of the TOAD brand, it was properly admitted, and was competent evidence to prove ownership, provided it was shown that said brand, at the time of the theft, belonged to the alleged owner of the stolen animal or to the company which he represented. It is no where shown, however, that said Lee, or said company represented by him, ever owned said brand. Said company owned some cattle in that brand, but did not own the brand itself, the same never having been transferred in the manner required by law, or in any other manner, so far as the proof shows. (Rev. Stats., Art. 4564.) Besides, it appears that this brand was recorded as the brand of W. K. Baylor and T. G. Kirbie, and it is no where shown that Kirbie ever at any time sold or transferred his interest in said brand. As far as is shown by the record, the legal title to the TOAD brand is still in Baylor and Kirbie.

We are of the opinion that the evidence fails to prove the allegation of ownership as to the particular animal mentioned in the indictment, and therefore the conviction is not sustained. There is not a particle of evidence, besides the bills of sale and the record of the brand, that the animal in question was ever in the possession of Lee, or that it was ever owned by the company

he represented, and, as we have before seen, said bills of sale and record are wholly insufficient to establish the allegation of ownership. Because of the insufficiency of the evidence, the conviction must be set aside.

Several objections are urged by counsel for the defendant to the charge of the court, and to the refusal of the court to give special requested instructions. We shall not pass upon all these objections in detail, but will remark that in one particular we think the charge is erroneous, to wit: The jury are instructed that, if the defendant bought the animal in *good faith*, they should acquit. We have heretofore held such a charge to be error. (McAfee v. The State, 14 Texas Ct. App., 668; Clayton v. The State, 15 Texas Ct. App., 348; Prator v. The State, Id., 363.)

The objection made to the indictment is not a good one. It clearly appears that the trial was had upon the original indictment.

Because the evidence of the ownership of the alleged stolen animal is insufficient to sustain the conviction, and because of the error mentioned in the charge of the court, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*